# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1099V

```
* * * * * * * * * * * * *        *
STEPHEN PEKA,                    *   Chief Special Master Corcoran
                                 *
         Petitioner,             *
                                 *
                                 *   Dated: January 15, 2025
v.                               *
                                 *
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *
                                 *
         Respondent.             *
                                 *
* * * * * * * * * * * * *        *
```

*David J. Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Zoe Wade*, U.S. Department of Justice, Washington, DC, for Respondent.

## DAMAGES DECISION[1]

On August 28, 2020, Stephen Peka filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Program").[2] ECF No. 1. Petitioner alleged that an influenza ("flu") vaccine administered to him on October 9, 2018, caused him to develop a shoulder injury related to vaccine administration ("SIRVA") – a Table injury. The matter went to trial on June 21, 2023, and I subsequently ruled in favor of Petitioner. *See Peka v. Sec'y of Health & Hum. Servs.*, No. 20-1099V, 2024 WL 1406421 (Fed. Cl. Spec. Mstr. Mar. 7, 2024).

The parties could not resolve damages on their own, and have instead briefed their positions. *See* Petitioner's Motion, dated Oct. 15, 2024 (ECF No. 77) ("Mot."); Respondent's Opposition, dated Nov. 27, 2024 (ECF No. 79) ("Opp."); Petitioner's Reply, dated Dec. 9, 2024 (ECF No. 81) ("Reply"). Petitioner requests $105,000.00 for actual pain and suffering, plus

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

$820.00 in unreimbursed past medical expenses. Mot. at 28-29. Respondent counters that Petitioner should receive a lower award (albeit of an unspecified amount) because of his moderate treatment, substantial gaps between dates of treatment, and also due to Petitioner's inability to establish that his upcoming surgical procedure is a sequela of his 2018 vaccine injury. *See generally* Opp. at 10-14.

For the reasons described below, **I find that Petitioner is entitled to an award of damages in the amount of $75,820.00**, representing compensation in the amount of $75,000.00 for actual pain and suffering, plus $820.00 for past medical expenses.

I.      **Factual Background**

*Entitlement Determination*

A more complete summary of the relevant medical history and factual background is contained in the entitlement decision. *See generally Peka*, 2024 WL 1406421. I incorporate that history herein. In short, although Petitioner was unable to satisfy all elements of a Table SIRVA claim, he did successfully establish entitlement to damages for a "SIRVA-like" post-vaccination injury. *Id.* at *15.

In particular, the medical record (supplemented with Petitioner's own testimony, plus input from experts on both sides) established that Petitioner experienced left arm pain not long after vaccination. *Peka*, 2024 WL 1406421, at *1-2. Notably, Petitioner had a history of left arm pain *prior* to receipt of the vaccine. *Id.* at *1. An x-ray of his left shoulder from August 2015 (three years prior to vaccination) revealed mild degenerative changes of the acromioclavicular joint and rotator cuff calcification, suggestive of calcific tendonitis. *Id.*; Ex. 3 at 213. While these prior conditions could not fully explain Petitioner's symptoms, they likely contributed to his persistent pain and discomfort over the course of several years. *Id.* at *2.

The overall record (which at the time of the June 2023 hearing reflected four and one-half years of post-vaccination treatment) was not, however, supportive of the conclusion that Petitioner's treatment was notably burdensome or invasive. Petitioner testified at the hearing that his left shoulder pain had neither improved nor worsened. *Peka*, 2024 WL 1406421, at *4. He explained that when his shoulder is at rest, it aches, and if his shoulder dangles, it becomes painful. *Id.* As of the hearing, Petitioner was taking pain medication periodically and visiting his chiropractor regularly. *Id.* Ultimately, he had received relatively-conservative care, in the form of medication, ten physical therapy sessions, and 18+ chiropractor visits. *Id.* at *1-2. Given his overall intermittent care (which had not yet required surgical intervention) and otherwise-mild symptoms, I characterized this case as one that did not merit a particularly large pain and suffering award. *Id.* at *15, 16.

*Post-Hearing Treatment*

One month after the hearing (in July 2023), Petitioner met with a physician at CentraCare Clinic River Campus in St. Cloud, Minnesota, and reported ongoing discomfort in his left shoulder. Ex. 22 at 16. In his notes, the physician stated that Mr. Peka "had a tear in his [left] shoulder 5 years ago, which has not subsided."[3] *Id.* Petitioner turned down the recommendation of surgery at this time, citing several previous surgeries and his need for "a break." *Id.* Petitioner returned to CentraCare in November 2023, but made no complaints of shoulder pain at this visit. *Id.* at 10-11.

In January 2024, Petitioner attended another appointment at CentraCare, and reported that he was now unable to sleep on his left shoulder or back because of continued pain. Ex. 22 at 5. Then in March 2024, Petitioner attended a follow-up appointment with CentraCare and complained that his shoulder "continued to bother him." Ex. 23 at 8. He decided to return to physical therapy and undergo another left shoulder MRI. *Id.* at 12. The MRI revealed moderate background supraspinatus tendinosis with low grade partial-thickness bursal sided tearing and moderate subacromial/subdeltoid bursitis. *Id.* at 6.

In June 2024, Petitioner followed up with CentraCare, at which point his diagnosis was documented as "nontraumatic complete tear of left rotator cuff." Ex. 23 at 3. The notes from this appointment state that Petitioner "has not had time to do formal physical therapy…He has done his own physical therapy regiment which has not provided him significant relief." *Id.* The physician discussed "operative management" with Petitioner, which would consist of a subacromial decompression and a possible rotator cuff repair of his bursal-sided tear. *Id.* Petitioner returned to physical therapy and agreed to move forward with surgical intervention, and his arthroscopic surgery is scheduled for March 17, 2025. *See* Peka Supplemental Affidavit, dated October 14, 2024 (ECF No. 76) (Peka Supp. Aff.); Ex. 25.

## II.  Parties Arguments

Petitioner requests $105,000.00 in actual pain and suffering, emphasizing that his shoulder pain has persisted for more than six years since the 2018 vaccination. Reply at 10. Petitioner has in fact scheduled arthroscopic surgery for this spring to address the underlying issue. *Id.* Petitioner explains that he has difficulty performing activities of everyday life like dressing himself and steering his car. *Id.* at 11. He is also unable to engage in the hobbies he loves – woodworking, metalworking, gardening, yardwork, boating, and ice fishing. *Id.* at 11.

---

[3] Although the record states that the tear was in Petitioner's *right* shoulder, this is likely an error. There is no evidence that Petitioner underwent an MRI of his right shoulder five years prior, but there is evidence of a *left* shoulder MRI from February 2019 that detected a tear in his rotator cuff. *See* Ex. 3 at 54-56. Additionally, Petitioner underwent surgery for repair of his *right* rotator cuff in February 2022, and there is no evidence a second surgical repair for the right shoulder was ever recommended. *See* Ex. 22 at 70.

Petitioner cites several non-surgery SIRVA cases that he deems comparable to the instant case, with damages ranging from $75,000.00 to $90,000.00. *See, e.g.*, *Parsons v. Sec'y of Health & Hum. Servs.*, No. 19-1150V, 2023 WL 9060490 (Fed. Cl. Spec. Mstr. Nov. 30, 2023) ($90,000.00 in pain and suffering, emphasizing that petitioner's shoulder pain had persisted for five years); *Balch v. Sec'y of Health & Hum. Servs.*, No. 20-0872V, 2023 WL 150783 (Fed. Cl. Spec. Mstr. Jan. 10, 2023) ($77,000.00 in pain and suffering, given petitioner still experienced limited ROM over two years post-vaccination); *Boyd v. Sec'y of Health & Hum. Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021) ($80,000.00 in pain and suffering where petitioner completed 19 PT sessions and her pain persisted for two and a half years); *Hartman v. Sec'y of Health & Hum. Servs.*, No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) ($75,000 in pain and suffering where petitioner's pain levels decreased after six weeks of physical therapy but continued to linger for over a year); *Mantagas v. Sec'y of Health & Hum. Servs.*, No. 20-1720V, 2023 WL 4573855 (Fed. Cl. Spec. Mstr. June 14, 2023) ($75,715.00 in pain and suffering where petitioner's pain worsened over the course of year, despite six weeks of PT).

Petitioner argues, however, that these cases are only instructive to the extent they support an award reflective of his pain and suffering *to date*. Mot. at 24. Because Petitioner plans to undergo arthroscopic surgery this spring, SIRVA pain and suffering determinations in cases involving surgery are more applicable – and such awards routinely go into the six figures. *Id.* at 25; *See e.g.*, *McKay v. Sec'y of Health & Hum. Servs.*, No. 21-0071V, 2023 WL 9231565 (Fed. Cl. Spec. Mstr. Dec. 11, 2023) ($127,500.00 for pain and suffering where petitioner's pain ranged from mild to severe throughout her injury until she opted for arthroscopic surgery, two years post-vaccination); *McCabe v. Sec'y of Health & Hum. Servs.*, No. 19-1916V, 2021 WL 6755494 (Fed. Cl. Spec. Mstr. Dec. 29, 2021) ($110,000.00 in pain and suffering where petitioner completed 32 PT sessions and then underwent arthroscopic surgery one and a half years after vaccination); *Davidson v. Sec'y of Health & Hum. Servs.*, No. 20-1617V, 2024 WL 1152539 (Fed. Cl. Feb. 8, 2024) ($110,000.00 in pain and suffering where petitioner's treatment over the course of two and a half years included PT, cortisone injections, and arthroscopic surgery). And Petitioner notes the existence of one non-surgery SIRVA case where a comparable award was issued. *See Desai v. Sec'y of Health & Hum. Servs.*, No. 14-811V, 2020 WL 8768069 (Fed. Cl. Spec. Mstr. Dec. 21, 2020) ($125,000.00 in pain and suffering where petitioner's pain continued to wax and wane despite undergoing extensive PT on and off for over three years).

Respondent maintains in reaction that an unspecified "lower amount" should be awarded. Opp. at 16. He theorizes that some of the medical records reference the wrong shoulder, suggesting that Petitioner's severely limited ROM as of December 2, 2021, was present in his *right* shoulder instead of his vaccinated left. *Id.* at 4 n.2; *see also Id.* at 7 n.4. Respondent also emphasizes that Petitioner's treatment was interrupted by "substantial gaps," and deems the medical care Petitioner received to consist only of "a prescription for antibiotics, a prescription for Medrol Dosepak, and 10 PT sessions." *Id.* at 10-12.

4

Respondent further argues that Petitioner's ongoing shoulder pain is not likely the product of his vaccine injury. Opp. at 13. Rather, Petitioner's doctors have attributed these symptoms to a rotator cuff tear, which has not been demonstrated to be vaccine-caused.[4] *Id.* To support this, Respondent points to the medical records from the past two years. Records from July 2023 and January 2024 reference a "tear" in Petitioner's left shoulder from several years ago that has not subsided. *Id.* (citing Ex. 22 at 14, 4). And on June 27, 2024, Petitioner's orthopedist diagnosed him with a "[n]ontraumatic complete tear of left rotator cuff" and suggested operative management including "possible rotator cuff repair of his bursal sided tear versus debridement." *Id.* (citing Ex. 23 at 12). Respondent also points out that Petitioner's expert, Dr. Naveed Natanzi, did not attribute Petitioner's rotator cuff tear to vaccination, and instead agreed that the majority of Petitioner's shoulder pathology was present prior to vaccination. *Id.* at 14; Tr. at 83.

For these reasons, Respondent argues, Petitioner has failed to show that his current condition is a sequela of his vaccine injury, and should therefore receive a more modest pain and suffering award. Opp. at 14. Respondent does not otherwise explicitly address Petitioner's scheduled arthroscopic surgery.

In his reply, Petitioner denies the existence of "substantial gaps" in his treatment course, emphasizing that he treated his shoulder injury with 18 chiropractic sessions during his alleged 2019 "six-month gap" in treatment. Reply at 2. He explains that the five-month gap in early 2020 was a result of his treatment being halted due to the emergence of the Covid-19 Pandemic. *Id.* Petitioner also addresses the alleged "sixteen-month gap" following his May 2020 PCP appointment. *Id.* at 3. Petitioner explains that during this time, he routinely underwent chiropractic treatment for his left shoulder symptoms that "started from a medical related injury." *Id.* (citing Ex. 19 at 15-46, 66).

Petitioner also denies the assertion that his rotator cuff tear is unrelated to his vaccine injury. Reply at 4. He notes that his expert, Dr. Natanzi, never definitively opined that the rotator cuff tear was unrelated to Petitioner's vaccine-related injury. *Id.* Dr. Natanzi also testified that Petitioner did not have anything "significant" going on with his shoulder prior to receiving the flu vaccine. *Id.* (citing Tr. 67-68). By contrast, Dr. Geoffrey Abrams, Respondent's expert, testified that rotator cuff tendonitis is commonly seen in the SIRVA context. *Id.* at 5. And the scheduled arthroscopic surgery will address both the Petitioner's rotator cuff tear *and* the increased fluid in Petitioner's bursa, which *is* predominantly related to the vaccine. *Id.*

---

[4] Notably, Petitioner does not allege that the October 2018 flu vaccination significantly aggravated his rotator cuff tear or other shoulder pathology.

5

**III.    Relevant Law on Damages Determinations**

   A.  *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(A)(i)–(iii). Petitioners bear the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

As noted above, this provision of the Act permits recovery of costs *to be incurred* for future care as well, although such costs must be shown to be "reasonably necessary." Section 15(a)(1)(A)(iii)(I)–(II). The meaning of the phrase "reasonably necessary" is somewhat imprecise, as I have recognized in other cases. *Barone v. Sec'y of Health & Hum. Servs.*, No. 11-707V, 2016 WL 3577540 (Fed. CL. Spec. Mstr. May 12, 2016). But it encompasses the idea that additional care aimed at maximizing an injured party's overall well-being (no matter how personally deserving the individual may be) is *not* in keeping with the scope of damages envisioned by the Program. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448135, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life"); *see also Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining the term to mean more than merely barely adequate, but less than the most optimal imaginable). And it goes almost without saying that such costs must *also* pertain to care associated with the alleged injury or its sequalae. Medical care a petitioner might receive, even if needed, that is not aimed at treatment of the vaccine injury at issue, or related to it, is not a reasonably necessary future care component.

   B.    *Pain and Suffering*

The Act caps pain and suffering awards at $250,000.00. Section 15(a)(4). There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (*quoting McAllister*

6

*v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). In so doing, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## ANALYSIS

**I.    Pain and Suffering**

Awareness of Petitioner's injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of his injury. In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents.[5] I also have considered prior awards for pain and suffering issued in comparable cases, although I ultimately base my determination on the circumstances of *this* case.

Overall, I find that Petitioner's "non-Table" SIRVA injury caused him persistent, albeit moderate pain, lasting over the course of several years. Petitioner sought treatment for shoulder pain promptly, within two weeks of vaccination. And although his symptoms improved within the first month, the pain worsened and then fluctuated over the following years.

However, the *degree and amount* of treatment Petitioner received (at least through June 2023) was conservative and limited, underscoring the mild nature of his injury. Thus, in all of 2019 he attended only ten PT sessions, and did not resume formal PT until *five years later*, in July 2024. Ex. 5 at 10-17; Peka Supp. Aff. at 2. Moreover, Petitioner's treatment course included numerous gaps and cessations. In response, Petitioner points to his frequent chiropractor visits. Reply at 2-3. But Petitioner's left shoulder injury was only *one* of many issues addressed at these appointments – he also reported headaches, upper and lower back pain, mid-back pain, and neck pain. Ex. 19 at 4, 59-60, 63. Ex. 13 at 1. And records from some of these sessions attribute Petitioner's symptoms

---

[5] Petitioner contends that the medical records should not be read in isolation, but instead should be read contemporaneously with Petitioner's own testimony. Reply at 6. I agree, which is why I have based my conclusions on consideration of the entire record. *See Cucuras v. Sec'y of Health & Hum. Servs.*, No. 91-994V, 26 Cl. Ct. 537, at *13.

7

to a motor vehicle accident in February 2022, which occurred after the relevant vaccination. Ex. 19 at 59-60, 63. Otherwise, Petitioner engaged in at-home exercises and was prescribed various medications. Ex. 5 at 17; Ex. 23 at 3; Ex. 3 at 73, 77. And he consistently opted for conservative treatment methods, turning down a steroid injection (Ex. 4 at 7) and declining further physical therapy when offered (Ex. 22 at 14, 16).

In addition (and certainly as of the time of the 2023 entitlement hearing), the record establishes that some of Petitioner's shoulder pain/discomfort stemmed from shoulder issues (rotator cuff tear, calcific tendonitis, and other chronic degenerative changes) that were not attributable to his vaccination injury. Indeed, Petitioner first started complaining about his left shoulder in August 2015 – three years *before* he received the flu vaccine – and evidence of these issues was established even after vaccination. Ex. 3 at 60, 213. As Petitioner's expert, Dr. Natanzi, acknowledged during the entitlement hearing, a February 2019 MRI showed "age-related wear and tear" that was unrelated to the issues Petitioner experienced following vaccination. Tr. at 83-84.

This is, therefore, a case involving a mild vaccine injury, with symptoms that cannot all be deemed vaccine-related, and that warranted only conservative treatment – at least through today's date. That still leaves the question of how to factor in Petitioner's *scheduled* shoulder surgery. Petitioner requests that I evaluate damages consistent with surgery SIRVA cases. But the record does not support a finding that Petitioner's vaccine-related injury, as opposed to his more generalized, unrelated shoulder issues, was the most likely source of his ongoing pain, therefore explaining the need for surgical intervention. For while the surgery will include a subacromial depression specific to treatment of bursitis, it will also address the age-related rotator cuff tear, which has not been shown to be vaccine-caused. Ex. 25 at 1. Petitioner's vaccination injury does not appear to be the predominant factor at play at this point.

In addition, the timing of the scheduled surgery undermines conclusions about its relationship to Petitioner's vaccine injury. It took Petitioner *six years* to schedule the surgery, and this occurred after years of limited treatment (not to mention after the hearing in which entitlement was determined). Petitioner's overall course is inconsistent with what is commonly seen in SIRVA cases, where the degree of pain and discomfort leads a claimant to require surgery. *See e.g.*, *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) ("The fact that Petitioner's injury did not merit more invasive treatment on a shorter timeframe undercuts her allegations of its severity, and therefore supports a lesser pain and suffering award than Petitioner requests."). And the passage of so much time from the date of vaccination allows for too many other possible intervening explanations for the need for surgery. I thus do not give great weight to the upcoming surgery as justifying a six-figure pain and suffering award.

I give somewhat more weight to the fact that Petitioner's discomfort has lingered for six years. As noted in *Parsons*, "there is a marked difference between a shoulder injury lasting a year

or less and one that persists for five years, and the pain and suffering award should reflect that." *Parsons*, 2023 WL 9060490, at *27. That petitioner, like Mr. Peka, continued to experience pain after attending several PT sessions, and eventually declined further PT (as well as a steroid injection). *Id.* at *6. Five years after the vaccination, the *Parsons* petitioner returned to his PCP complaining of persistent shoulder pain that continued to affect his every-day life. *Id.* at *10. I awarded that claimant $90,000.00 for actual pain and suffering, noting the considerable length of his injury. *Id.* at *27.

*Parsons* is a reasonable comparable determination, but with one significant difference: the *Parsons* petitioner had *no history of shoulder pain* prior to vaccination (*id.* at *4-5), while this record documents degenerative changes in Petitioner's left arm/shoulder dating back to 2015. Ex. 3 at 213. As a result, the pain and suffering amount awarded in *Parsons* is somewhat too high for present purposes. But Respondent's contention that I award an unspecified lower amount is also of limited utility. Apart from arguing persuasively that Petitioner's current condition is not a sequela of his vaccine injury, Respondent does not address any of the cases cited by Petitioner, nor does he maintain that any other past cases are more fitting comparisons. Thus, Respondent's objection to Petitioner's demand – "give him less" – provides me with very little to go on when it comes to calculation of the pain and suffering award to be issued.

The best guidance I have located on this issue is found in a decision that was not offered by either party (and which I authored) – *Allner v. Sec'y of Health & Hum. Servs.*, No. 19-1048V, 2022 WL 6962656 (Fed. Cl. Spec. Mstr. Sept. 9, 2022). The petitioner in *Allner* received intermittent, conservative treatment for a mild SIRVA that lingered for over four years. *Allner*, 2022 WL 6962656, at *6. She completed around the same amount of PT sessions as Mr. Peka (eight compared to ten in this case), but also received five steroid injections to relieve her pain, while Mr. Peka received none. *Id.* In addition, the *Allner* petitioner's treatment course included multiple, lengthy gaps, suggesting both that her pain was not severe enough to require consistent medical attention, and also that the multiple steroid injections she received had been helpful in managing her shoulder pain. *Id.* And the *Allner* petitioner's shoulder pain was not entirely due to her SIRVA injury, as she also suffered osteoarthritis. *Id.* This situation is comparable to Mr. Peka's case, as his shoulder pain can be partially explained by long-term degenerative changes and a rotator cuff tear. Ultimately, the *Allner* petitioner was awarded $60,000.00 in pain and suffering. *Id.* at *7.

Taking the foregoing into account, I conclude that a just award for actual pain and suffering in this case falls somewhere between *Parsons* and *Allner*. **Accordingly, Petitioner will be awarded $75,000.00 for past pain and suffering**.

## II.     Unreimbursed Medical Expenses

Petitioner requests $820.00 in unreimbursed expenses for medical copays. Mot. at 28; 31-38. I find that this request to be reasonable and substantiated by the record, and Respondent has not proposed any objection to it. This aspect of Petitioner's damages demand shall therefore be awarded in full.

## CONCLUSION

Based on the record as a whole and arguments of the parties, I award Petitioner a lump sum payment of **$75,820.00** (representing $75,000.00 for Petitioner's past pain and suffering and $820.00 for past unreimbursed medical expenses), to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement. This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court SHALL ENTER JUDGMENT in accordance with the terms of this Decision.[6]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.